UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

FRANK PEROZZI, JR.,                               :

                        Plaintiff,                :      OPINION & ORDER
                                                         17 Civ. 825 (GWG)
              -against-                           :

NANCY A. BERRYHILL,                               :
Acting Commissioner of Social Security
                                                  :
                        Defendant.[1]
------------------------------------------------------------------x

GABRIEL W. GORENSTEIN, United States Magistrate Judge

        Plaintiff Frank Perozzi, Jr., brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security (the "Commissioner")

denying his claim for disability benefits under the Social Security Act.  Both parties have moved

for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[2]  For the

reasons stated below, the Commissioner's motion is denied, Perozzi's motion is granted, and the

case is remanded.

---

[1]  Nancy A. Berryhill is substituted as the defendant in this suit pursuant to Rule 25(d) of
the Federal Rules of Civil Procedure.

[2]  See Notice of Motion, filed July 23, 2017 (Docket # 14); Plaintiff's Memorandum of
Law, filed July 23, 2017 (Docket # 15) ("Pl. Mem."); Notice of Response and Cross-Motion,
filed Sept. 26, 2017 (Docket # 16); Memorandum of Law in Response to Plaintiff's Motion for
Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion, filed Sept. 26,
2017 (Docket # 17) ("Comm'r Mem."); Plaintiff's Reply Memorandum of Law, filed Oct. 6,
2017 (Docket # 18) ("Pl. Reply"); Reply Memorandum of Law in Further Support of the
Commissioner's Motion for Judgment on the Pleadings, filed Oct. 31, 2017 (Docket # 19)
("Comm'r Reply").

## I. BACKGROUND

### A. Procedural History

On June 25, 2013, Perozzi applied for disability insurance benefits ("SSDI") and supplemental security income ("SSI"), alleging that he was disabled as of June 13, 2009.[3] See Certified Administrative Record, filed May 24, 2017 (Docket # 12) ("R."), at 95, 152-61. The Social Security Administration ("SSA") denied these claims on November 26, 2013. R. 96. Two months later, on January 23, 2014, Perozzi requested a hearing before an Administrative Law Judge ("ALJ"). R. 104. That hearing occurred on June 16, 2015. R. 37-67. On August 28, 2015, the ALJ issued a decision that found Perozzi not disabled within the meaning of the Social Security Act (the "Act"). R. 14-36. Perozzi appealed that decision to the Appeals Council, which denied his request for review on January 19, 2017. R. 1-7. This action followed.

### B. Hearing Before the ALJ

Perozzi was represented by his attorney, Gideon Miller, at the hearing before the ALJ. R. 37-67.

Perozzi testified that the last time he worked was as a "maintenance helper" for the Rockland County Sewer Department in 2009. R. 44-46. He has not worked since. R. 46. He testified that he suffers from constant back pain, as well as side effects of fatigue and an inability

---

[3] We note that Perozzi states that he applied on August 15, 2013, Pl. Mem. at 2, and two forms in the administrative record, "Application Summary for Disability Insurance Benefits," R. 152, and "Application Summary for Supplemental Security Income," R. 156, state that Perozzi applied for SSDI and SSI on August 15, 2013. The Commissioner in her memorandum, however, states that Perozzi "protectively filed" on June 25, 2013, Comm'r Mem. at 1, meaning that June 25 was the first time Perozzi contacted the SSA. Consistent with this assertion, the filing date on Perozzi's "Disability Determination and Transmittal" form is June 25, 2013, R. 95, and the ALJ's opinion states that Perozzi filed his application on June 25, 2013, R. 17. Because the earlier filing date benefits Perozzi, we use June 25, 2013 as the date on which Perozzi applied for benefits.

to concentrate from the pain medication he takes.  R. 47-48.  It is "hard for [him] to sit for long periods of time," usually for no more than 15 minutes without discomfort; he can walk "[m]aybe down the block" but uses a cane "on occasion" that is not prescribed by a doctor; he can stand for no more than 10 to 15 minutes; he can lift "10 pounds at the most"; he has difficulty bending down; and he lies down "quite a few times for minimum a half-hour" during the day after taking his medications.  R. 48-50, 53.  He suffered a heart attack in 2013, but his heart condition now is "pretty good" although his blood pressure is "slightly high" and his "pulse runs high."  R. 47-48.  He also has gout, but "it's controlled."  R. 48.  A life-long learning disability impairs his reading comprehension.  R. 50-51.

With regard to daily activities, Perozzi showers every other day, but relies on the "aid of grab bars . . . the bench, [or] some sort of leverage"; he does not perform household chores like cooking, except he sometimes does the laundry; he occasionally does "a little light grocery shopping, just whatever [he] can carry"; and he socializes "maybe like once a month" with a friend at whose house he drinks a bit and listens to music.  R. 51-53.  He otherwise passes the time "mostly lying down on the bed" and watching television or reading short articles.  R. 52-53.  He drives, but does so "very little" per week and only locally.  R. 44.

Perozzi has not undergone surgery on his back, but has received two epidural shots, which did not help, and physical therapy "for a few months" that also "wasn't helping."  R. 51.  Perozzi testified that he does not see anyone for his "mental problems."  Id.

After hearing from Perozzi, the ALJ called Barbara Ellen Burk, a vocational expert ("VE"), for her opinion as to the claimant's previous work capacity based on his testimony.  R. 54.  Perozzi had testified that his past work was as a

maintenance helper . . . [and it] involved a lot of heavy . . . lifting, maintaining the

sewer . . . lines and going to pump stations and . . . helping the pump station operator with the maintenance and the upkeep of the pump house, which was a lot of lifting of heavy weight, and climbing up and down the stairs, and a lot of tools and equipment for whatever job had to be done.

R. 45. Based on this testimony, VE Burk categorized Perozzi's past work as either "municipal maintenance worker" or "highway maintenance worker" and described it as demanding a "heavy" level of exertion. R. 57. Perozzi had also testified to his work as a "surveyor helper" prior to starting his job with Rockland County in 2001. R. 46. VE Burk described that job as demanding a "medium" level of exertion, based off how Perozzi had described it. R. 58.

The ALJ then described a person of Perozzi's age, education, and work experience who could perform sedentary work, but who could only occasionally climb stairs and ramps; could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, crouch, kneel, and crawl; must avoid unprotected heights and hazardous machinery; must be provided a "sit/stand option" once every two hours; and should avoid wetness, humidity, and extreme heat and cold. R. 58. The VE testified that such a person could not perform his or her past work, but could perform the jobs of small products assembler, telephone solicitor, printed circuit board assembly touch-up screener, and cashier II, all of which exist in significant numbers in the national economy. R. 59-62. All these jobs permit an employee to "sit and stand as they need to" so long as the person remains at their work station. R. 59. The VE did note that "[small products assembler] is in the [Dictionary of Occupational Titles] at light," but she testified that in her experience there are many such jobs at the sedentary level. R. 60. But if the hypothetical person was limited to sitting for less than six hours in an eight-hour work day, standing and walking for only two hours of an eight-hour work day, occasionally lifting or carrying weights that are less than ten pounds, and that person would be off task 15 percent of the work day and absent three

or more times per month, then the VE testified that there would be no jobs such a person could perform in the national economy.  R. 62-63.

C.  Medical Evidence

Both Perozzi and the Commissioner have provided summaries of the medical evidence contained in the administrative record.  See Pl. Mem. at 3-10; Comm'r Mem. at 1-14.  The summaries are substantially consistent with each other.  The Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed May 26, 2017 (Docket # 13), at ¶ 5, and neither party has done so.  Accordingly, the Court adopts the plaintiff's and the Commissioner's summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit.  We discuss the medical evidence pertinent to the adjudication of this case in section III below.

D.  The ALJ's Decision

The ALJ denied Perozzi's application for benefits on August 28, 2015.  R. 14.  The ALJ found that Perozzi met the insured status requirements of the Act through December 31, 2015, and that he had not engaged in substantial gainful activity since June 13, 2009, the alleged onset date.  R. 19.  The ALJ found that Perozzi had the following severe impairments: "degenerative disc disease, disc herniations and scoliosis of the lumbar spine, left L2-3 radiculopathy; coronary artery disease, status post myocardial infarction, status post cardiac stentings, hypertension, and hyperlipidemia."  Id.  He also recognized that Perozzi had obesity at various times of his treatment.  R. 20.  He found, however, that Perozzi's gout and related renal insufficiency were managed with medication.  Id.  He also found that Perozzi's stated learning disability did not more than minimally limit his ability to perform basic mental work activities, noting that he demonstrated no cognitive deficits at the hearing or at the Social Security Field Office; that he

had achieved an IQ score of 82, placing him in the low average range of intelligence; that he read at an approximately 12th grade reading level; that independent examiners reported only mild functional limitations; and that in any case, he had worked successfully with the learning disability for many years.  R. 20-21.

The ALJ then determined that none of Perozzi's severe impairments met or medically equaled an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  R. 22.  The ALJ specifically considered Listing 1.04, Disorders of the Back, see 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04 ("Listing 1.04"), and Listing 4.04, Ischemic Heart Disease, see id. § 4.04 ("Listing 4.04").  R. 22.  The ALJ found that Perozzi's degenerative disc disease did not meet Listing 1.04, because

> the record does not demonstrate compromise of a nerve root (including the cauda equina) or the spinal cord with additional findings of: A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising; or B) spinal arachnoiditis; or C) lumbar spinal stenosis resulting in pseudoclaudication.

Id.

> Likewise, the ALJ found that Perozzi failed to meet Listing 4.04, because

> [he did] not have a sign- or symptom-limited exercise tolerance test demonstrating at least one of the manifestations described in the Listing at a workload equivalent to five METs or less.  He has not had three separate ischemic episodes, each requiring revascularization or not amenable to revascularization within a twelve-month period.  The claimant further does not have coronary artery disease demonstrated by appropriate medically acceptable imaging, and, in the absence of an exercise tolerance or drug-induced stress test, a medical consultant has concluded that performance of exercise tolerance testing would present significant risk to the individual with angiographic evidence showing significant narrowing as contemplated in the Listing and very serious limitations in the ability to independently initiate, sustain or complete activities of daily living.

Id.  Although the ALJ recognized that Listing 4.00(H)(1) directs an ALJ to evaluate hypertension with reference to specific body systems affected under that listing, the ALJ found "no evidence in the medical file of a specific body system so affected as to meet a listing." Id.  The ALJ noted that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any Listed impairment."  Id.

Turning next to Perozzi's residual functional capacity ("RFC"), the ALJ determined that Perozzi could perform the full range of sedentary work, except insofar as it required him to climb stairs and ramps, or balance, stoop, crouch, knee, and crawl more than occasionally.  R. 23.  The ALJ also added that Perozzi would have to be provided an option to sit and stand, once every two hours, and must avoid wetness, humidity, and temperature extremes of heat and cold. Id.

In compiling Perozzi's RFC, the ALJ weighed the opinions of various treating and consulting sources, giving the opinions "great weight," "some weight," or "little weight."  R. 24-29.  As for the opinions of physicians on Perozzi's back problems, the ALJ gave "great weight" to only one opinion — that of Dr. Julia Kaci, a consultative examiner for Perozzi's SSI and SSDI claims.  R. 26.  She had opined that Perozzi had "moderate limitations with walking, standing, sitting, pushing, pulling, bending, climbing and lifting or carrying," but "no limitations with his hands."  R. 26.  After summarizing her findings and opinion, the ALJ noted that her findings "support a residual functional capacity for sedentary work."  Id.

The ALJ gave "some weight" to the opinions of three treating sources and two examining sources.  The three treating sources, Drs. Todd Askensas (a chiropractor), Thomas Bottiglieri, and Jack Stern, had opined in 2009 and 2010 that Perozzi "was not a surgical candidate" and that he could promptly return to work after a conservative course of treatment including "physical

7

therapy, osteopathic manipulative therapy, a home exercise program and anti-inflammatory medication and an epidural injection." R. 24-25. Noting that the opinions were rendered in accordance with the standards of the New York State Workers' Compensation Act, the ALJ gave these opinions "some weight." Id. Likewise, the ALJ gave some weight to the opinion of Dr. Robert Hendler, an independent medical examiner, who had opined that Perozzi "was able to work" so long as he lifted no more than twenty pounds and did not bend repeatedly or stand "for periods of greater than two hours, without taking a break." R. 25. Again, the ALJ noted that the opinion was due less weight because it was rendered in the context of Perozzi's workers' compensation case. Id. The ALJ also gave some weight to the opinion of Dr. Charles Sallahian, a chiropractor and independent medical examiner, that Perozzi could work "in a sedentary position with restrictions of heavy lifting and repetitive bending." R. 26. Here, the ALJ appears to have given Dr. Sallahian's opinion less weight due only to his status as a chiropractor. Id.

Earning only "little weight" were the opinions of Dr. Gerald Gaughan, a treating source, who saw Perozzi from 2011 through the date of the hearing before the ALJ. R. 27. The ALJ gave "little weight" to Dr. Gaughan's opinions that Perozzi was "totally disabled and unable to work in any capacity," that Perozzi could "occasionally lift and carry less than ten pounds; and less than five pounds frequently; stand and/or walk for up to two hours in an eight hour workday; and sit for less than six hours in an eight hour workday," that Perozzi "would require a fifteen minute unscheduled break every thirty minutes," that Perozzi "needed to avoid wetness, humidity, temperatures extremes and heights," and that Perozzi "would be absent from work more than three times a month." R. 27-28. In explaining the weight given, the ALJ observed that a "claimant's treating physician in the context of a workers' compensation claim often serves as an advocate for the claimant and describes excessive limitations to enhance the

claimant's financial recovery." R. 28. He also noted that the definition of disability in the workers' compensation context differs from that of the Act, and that "the opinions of Drs. Kaci, Handler, Bottiglieri and Salliahan [are] more persuasive and more consistent with the overall medical records and claimant's activities of daily living." Id.

As for Perozzi's heart problems, the ALJ observed that Drs. John Fitzpatrick and Michael Innerfield generally reported that Perozzi "was doing well," in that his heart had regular rate and rhythm, he had normal range of motion and muscle strength in all four extremities, he was losing weight, and he "exercised three to four times a week." R. 28-29. He did not explicitly assign any weight to their opinions, but gave "great weight" to the corroborating report of Dr. A. Auerbach who opined that Perozzi "was capable of lifting twenty pounds occasionally and ten pounds frequently, stand/walk for six hours in an eight hour workday and sit for six hours in an eight hour workday." R. 29. The ALJ noted, however, that Dr. Auerbach's opinion was "limited just to the cardiovascular aspect of the case." Id.

The ALJ also weighed Perozzi's subjective complaints of pain and discomfort, finding them not wholly credible. R. 24. The ALJ noted that despite Perozzi's complaints of severe back pain, Perozzi had reported to Drs. Melissa Antiaris and Kaci that he prepares simple meals, performs light cleaning, does the laundry, drives, showers and dresses himself, exercises three to four times a week, and has "sought work 'on and off' since his accident." Id. His driving, in particular, showed to the ALJ "an ability to deal with the stress inherent [in driving]," an ability to use hand and foot controls, and a presumed "ability to turn one's head to back up and change lanes." Id. Adding to the ALJ's perception that Perozzi's subjective complaints of debilitating symptoms were not wholly credible, the ALJ observed that Perozzi's medical records showed that he has received only routine treatments for his alleged disabilities and that he "continually

advises his physician that he feels well and the physician continually notes he looks well." Id. Last, the ALJ observed no evidence of Perozzi's debilitating symptoms at the hearing, further reducing the credibility of Perozzi's subjective complaints. Id.

After determining Perozzi's RFC, the ALJ turned to the question of whether Perozzi could return to his past work. R. 30-32. Relying in large part on the testimony of VE Burk that a person of Perozzi's age, education, experience and RFC could no longer perform the jobs of municipal maintenance worker and surveyor helper, the ALJ concluded that Perozzi could no longer perform his past relevant work. R. 30-31. The ALJ then moved on to consider whether Perozzi could successfully transition to other work in the national economy. R. 30-32. Again relying on the VE's testimony and also materials in the record, the ALJ concluded that Perozzi could successfully transition to other work. R. 31-32. Accordingly, the ALJ found Perozzi "not disabled" under the Act and denied his application for benefits. Id.

II. GOVERNING STANDARDS OF LAW

A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting Consol. Edison

Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," §§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. part 404, subpart P, appendix 1, or is

equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. See §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

C. The "Treating Source" Rule

In general, the ALJ must give "more weight to medical opinions" from a claimant's treating sources when determining if the claimant is disabled. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician") (citation omitted). Treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the claimant's] case record." Id. Inversely, the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); accord Selian, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citations omitted).

If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion or face remand. See Greek, 802 F.3d at 375 (quoting Burgess, 537 F.3d at 129-30). When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. See 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. §§ 404.1527(c), 416.927(c)). The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see also Greek, 802 F.3d at 375-77.

III. <u>DISCUSSION</u>

Perozzi makes a number of arguments attacking the ALJ's decision. He contends (1) that the ALJ should have found that he met Listing 1.04, Pl. Mem. at 11-14; (2) that the ALJ improperly applied the "treating source rule" by awarding insufficient weight to the opinions of Dr. Gaughan, Pl. Mem. at 14, 16; and (3) that the RFC assessed by the ALJ for Perozzi was not supported by substantial evidence, Pl. Mem. at 18. We examine each argument in turn.

A. <u>Physical Impairment Listing 1.04</u>

Perozzi argues that the ALJ erred in finding that he did not meet Listing 1.04, and in particular the factors of subparagraph (A) of that listing, because (1) the ALJ's failure to properly explain the reasoning behind his conclusion suggests that the ALJ "never actually considered whether Perozzi met the listing" and issued a "form or boilerplate Step Three finding," Pl. Reply at 2; and (2) the medical records contain indisputable evidence of all the required medical findings for a listing, Pl. Mem. at 12-14.

As with all steps except the final one, Perozzi bears the burden of showing that he meets the Listing. <u>Poupore</u>, 566 F.3d at 306. To meet this burden, Perozzi must "meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (citations and emphasis omitted); <u>see also</u> 20 C.F.R. §§ 404.1525(c)(3), 404.1529(d)(2)-(3). To show that he meets the criteria, he "must offer medical findings equal in severity to all requirements, which findings must be supported by medically acceptable clinical and laboratory diagnostic techniques." <u>Knight v. Astrue</u>, 32 F. Supp. 3d 210, 218 (N.D.N.Y. 2012) (citing 20 C.F.R. § 416.926(b)).

To satisfy Listing 1.04, a claimant must make a threshold showing that he suffers from a

"Disorder of the spine (e.g., herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. A claimant must also demonstrate

> [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

Id.

Here, the ALJ conducted no analysis whatsoever of the elements of the listing. Instead the ALJ simply repeated the Listing criteria, stating that Perozzi did not meet the elements. R. 22. Thus, the ALJ's ruling does not specify which element or elements of Listing 1.04 the ALJ concluded were not met. Id.

Notwithstanding this failure, case law holds that a court has the power to uphold an ALJ's conclusion at step three of the analysis in the "absence of an express rationale . . . [where] portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982); accord Salmini v. Comm'r of Soc. Sec., 371 F. App'x. 109, 112-13 (2d Cir. 2010) (summary order); Gonzalez v. Colvin, 2016 WL 5477591, at *13 (E.D.N.Y. Sept. 28, 2016); Sava v. Astrue, 2010 WL 3219311, at *3-4 (S.D.N.Y. Aug. 12, 2010). In Berry, the Second Circuit upheld an ALJ's determination that the claimant did not meet Listing 1.04, even though the ALJ provided no explanation for his conclusion. 675 F.2d at 469. Berry explained:

> in spite of the ALJ's failure to explain his rejection of the claimed listed impairments, we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by

substantial evidence.  Cases may arise, however, in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ.  In such instances, we would not hesitate to remand the case for further findings or a clearer explanation for the decision.  Thus, in future cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment.

Id. (citations omitted).  Other cases have followed Berry.  See, e.g., Solis v. Berryhill, 692 F. App'x 46, 48 (2d Cir. 2017) (summary order) ("Although the ALJ did not explicitly discuss Listing 11.14, his general conclusion (that Solis did not meet a listed impairment) is supported by substantial evidence.") (citing Berry, 675 F.2d at 468); Salmini, 371 F. App'x at 112-13 ("Here, although the ALJ might have been more specific in detailing the reasons for concluding that plaintiff's condition did not satisfy a listed impairment, other portions of the ALJ's detailed decision, along with plaintiff's own testimony, demonstrate that substantial evidence supports this part of the ALJ's determination.") (citing Berry, 675 F.2d at 469); Otts v. Comm'r of Soc. Sec., 249 F. App'x 887, 889 (2d Cir. 2007) (summary order) ("While the ALJ might have been more specific in detailing the reasons for concluding that [the plaintiff's] condition did not satisfy a listed impairment, the referenced medical evidence, together with the lack of compelling contradictory evidence from the plaintiff, permits us to affirm this part of the challenged judgment.") (citing Berry, 675 F.2d at 468).

Thus, we reject Perozzi's apparent contention that remand is absolutely required whenever an ALJ fails to provide an express rationale for his step three conclusion.  See Pl. Reply at 3.  The one case cited by Perozzi in support of his view, Torres v. Colvin, 2015 WL 4604000, at *3-4 (W.D.N.Y. July 30, 2015), is in fact consistent with the rule as stated by the Berry court.  In Torres, the district court remanded an ALJ's decision that was "essentially a

restatement of the Listing criteria," finding that as a result, the court could not "determine whether the ALJ properly considered the Listing." 2015 WL 460400, at *4. In doing so, the court noted that "the record evidence suggests that Plaintiff's symptoms could meet the Listing requirements," yet the paucity of the ALJ's reasoning left the court "unable to assess whether the ALJ's decision is supported by substantial evidence." Id. Thus, Torres found, consistent with the Berry standard, that upon reviewing the record, it was "unable to assess" the ALJ's rationale. Id.; cf. Berry, 675 F.2d at 469 (noting that remand may be required where the court is "unable to fathom" the ALJ's rationale in relation to evidence in the record).

As Berry noted, however, where "credibility determinations and inference drawing is required of the ALJ" to form his conclusion at step three, then remand for the ALJ to explain his reasoning is required. 675 F.2d at 469; see also Ryan v. Astrue, 5 F. Supp. 3d 493, 507-08 (S.D.N.Y. 2014) (examining case law following Berry and concluding that remand is appropriate where there is insufficient uncontradicted evidence in the record to support the ALJ's step three conclusion); accord Gonzalez, 2016 WL 5477591, at *13 (citing Ryan, 5 F. Supp. 3d at 507-08); Duran v. Colvin, 2016 WL 5369481, at *10 (S.D.N.Y. Sept. 26, 2016) (remanding for reconsideration of step three, "[b]ecause the ALJ failed to fully address the medical evidence that potentially meets the listing requirements," and thus, "[the court could not] conclude that there is 'sufficient uncontradicted evidence in the record to provide substantial evidence for the conclusion that [p]laintiff failed to meet step three.'") (citation omitted); Norman v. Astrue, 912 F. Supp. 2d 33, 41 (S.D.N.Y. 2012) (remanding decision because "[i]n light of the ALJ's failure to explain his reasoning and the conflicting medical evidence in the record, this Court cannot conclude by looking at 'sufficient uncontradicted evidence' that the ALJ's decision was supported by substantial evidence.") (citation omitted).

18

Here, there is enough evidence in the record to support Perozzi's contention that he met the various elements of the listing that we cannot be assured that the ALJ, after making a reasoned consideration of those elements, would have found that Perozzi did not meet the listing.

The threshold showing to meet Listing 1.04A is evidence of a "[d]isorder of the spine (e.g., herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Here, an August 2009 MRI showed a disc protrusion causing moderate compression of the sac of the right L2 nerve root. R. 266. As the ALJ observed, the MRI also showed "a disc protrusion at the L3-L4 level mildly compressing the L-[3] nerve roo[t]." R. 24-25.[4] Subsequent imaging in 2013 showed "degenerative disc disease [at L1-2] with a herniated disc into the right anterior epidural space and lateral recess"; at L2-3, "degenerative disc disease with spondylosis and diffuse bulging of the disc annulus with small left-sided disc extrusion into the lateral recess"; and at L3-4, "degenerative spondylosis, generalized bulging of the disc annulus, and a small disc extrusion into the right anterior epidural space." R. 483. A third MRI in 2014 showed that "disc degeneration remains most advanced at L2-3 . . . with increasing caudal migration impinging upon the region of the right L4 nerve root sleeve." R. 478. It also found "mild stenosis at L2-3 and L3-4" and "right facet osteoarthritis." R. 478. The Commissioner contends that the 2009 MRI finding "was not noted during any subsequent imaging of Plaintiff's spine." Comm'r Mem. at 19 n.7; see also Comm'r Reply at 1. But given that the ALJ acknowledged the 2009 MRI in his decision, R. 24, and did not discount the finding on account of the subsequent MRIs,

---

[4] While the ALJ wrote "room" and "L-2," R. 25, we assume he meant "root" and "L-3" based on the imaging report, R. 266.

we find ourselves unable to conclude, as the Commissioner urges, that the ALJ found Perozzi did not meet the first listing requirement. Perozzi may have met the requirement based on the 2009 MRI and subsequent MRIs.

If the threshold requirement is met, a claimant still must show that he satisfies all the paragraph A criteria. Thus, Perozzi must show "neuro-anatomic distribution of pain." Here, there was evidence of radicular pain consistent with compression of the right L2 nerve root and mild impingement of the L3 nerve root. R. 266. EMG testing in August 2010 and February 2013 appeared to show findings consistent with left L2-L3 radiculopathy, see R. 479-480, and Dr. Gaughan assessed "left lumbosacral radiculopathy" in June 2015, R. 619. Left-sided radiculopathy is not perfectly consistent with compression of the right L2 nerve root, but the result might show "neuro-anatomic distribution of pain" consistent with compression of an L2-L3 nerve. The Commissioner directs us to no evidence from the record that contradicts these results and the ALJ expressly found that Perozzi has "left L2-3 radiculopathy." R. 19. Accordingly, Perozzi may have met the second listing requirement.

The remaining criteria are "limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and . . . positive straight-leg raising." § 1.04A. The regulations define "motor loss" as "atrophy with associated muscle weakness" or "muscle weakness." Id. The regulations further specify that "significant motor loss" may be shown by an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(E)(1). Here, assessments from several doctors showed motor loss and limited motion of the spine. Dr. Gaughan observed that Perozzi's motion of the spine was "limited by lumbar dysfunction," R. 513, 619, and identified "[d]ecreased sensibility to vibration over the left anterior thigh" five times between 2014 and 2015, R. 492, 495 513, 516, 619. Dr. Gaughan

20

also found muscle atrophy associated with muscle weakness at October 2014 and June 2015 exams. R. 515, 619. Dr. Kaci similarly noted limited extension, rotary movement, and lateral flexion at the lumbar spine, R. 335, and observed that Perozzi's "gait [was] slow and guarded. He [could not] walk on heels and toes because of low back pain," id. Dr. Bottiglieri, for his part, noted that Perozzi's "[r]ange-of-motion is moderately limited in flexion," R. 236, though the ALJ described this finding as "just mild[] restrict[ion]" of the lumbar flexion, R. 25. Additionally, Dr. Sallahian observed limited range of motion of the lumbar spine with consistent complaints of lower back pain, though he concurrently noted that Perozzi's coordination, station, and gait "were within normal limits" and that a "motor and sensory examination of the lower extremities did not reveal any deficits." R. 231.

The same doctors also observed positive straight-leg raising: Dr. Gaughan found positive straight-leg raising at a January 2014 assessment, R. 504; October 2014 assessment, R. 516; February 2015 assessment, R. 513; and June 2015 assessment, R. 619. Dr. Kaci found positive straight-leg raising "at 30 degrees bilaterally" at her November 2013 assessment, R. 335, and Dr. Sallahian noted that "[s]upine straight leg raise was accomplished to 45 [degrees] on the right with a complaint of right lower back and buttock pain and to 60 [degrees] on the left without complaint," R. 231.[5]

Together, this medical evidence potentially meets the Listing 1.04A requirements. While the ALJ noted the various weights he attributed to the opinions of each doctor, those weights do not illuminate how the ALJ weighed the specific medical evidence cited above or what inferences the ALJ drew.

_____

[5] It is unclear to us whether Drs. Gaughan, Kaci, and Sallahian found positive straight-leg raise tests in both sitting and supine positions. See R. 231, 335-36, 504.

We also recognize that some contradictory findings are contained in the record, as noted by the Commissioner.  See Comm'r Mem. at 19-20; Comm'r Reply at 2-3.  Drs. Hendler and Semble, for instance, observed normal range of motion, reflexes, and no atrophy or evidence of reduced strength in the lower extremities.  R. 227, 264.  Similarly, Dr. Fitzpatrick, Perozzi's cardiologist, consistently found that Perozzi had "normal muscle strength, range of motion, and stability in all extremities," R. 28, 390, 394, 402, 406, 415, and Dr. Bottiglieri, one of Perozzi's treating physicians, observed that Perozzi had normal muscle strength, intact sensation, and negative straight-leg raising tests, R. 235-36.

But given the disputed evidence, we find ourselves in the same situation as the court in Norman:

> Although it may be the case that the ALJ would ultimately have decided that plaintiff's impairments did not meet or equal the requirements of Listing 1.04A, this possibility does not relieve the ALJ of his obligation to discuss the potential applicability of Listing 1.04A, or at the very least, to provide plaintiff with an explanation of his reasoning as to why plaintiff's impairments did not meet any of the listings.

912 F. Supp. 2d at 81.

Kretovic v. Colvin, 2015 WL 1297875 (W.D.N.Y. Mar. 24, 2015), cited by the Commissioner, Comm'r Reply at 4, is distinguishable.  In Kretovic, the district court upheld an ALJ's finding that the claimant did not meet Listing 1.04A, because in its view of the evidence, the claimant "ha[d] not adduced evidence establishing that her impairment meets the Listing." 2015 WL 1297875, at *23.  In this case, however, it appears that evidence could be found in the record that, if given sufficient weight, meets all the elements of Listing 1.04.  Moreover, the ALJ in Kretovic provided a much more detailed explanation of why the Listing requirements were not met, with citations to the record and an explanation of exactly which elements of the Listing

the ALJ found were not met.  Id.  Here, the ALJ has provided to the Court no explanation for his

rationale.  As Norman explained, "it is not for [the court] to reconcile the conflicting medical

evidence in the record — that is the obligation of the ALJ."  912 F. Supp. 2d at 79.

In light of the evidence that favors a finding that the listing was met, "the ALJ must

provide an explanation of his reasoning as to why he believes the requirements are not met and

explain the credibility determinations and inferences he drew in reaching that conclusion."

Ryan, 5 F. Supp. 3d at 509 (citations omitted).  On remand, the ALJ should assess whether

Perozzi meets Listing 1.04A.  If the ALJ chooses to reaffirm his prior conclusion, he should

provide "a clearer explanation" for his decision.  Berry, 675 F.2d at 469.

B.  Evidence Supporting Claimant's Residual Functional Capacity

Perozzi also disputes the ALJ's evaluation of his RFC.  Pl. Mem. at 18.  The ALJ

assessed Perozzi with the following RFC:

> the claimant [may] perform sedentary work as defined in 20 CFR [sic]
> 404.1567(a) and 416.967(a) except he can occasionally climb stairs and ramps,
> but he can never climb ladders, ropes or scaffolds.  He can occasionally balance,
> stoop, crouch, knee and crawl.  He must avoid unprotected height and hazardous
> machinery.  He is to be provided a sit/stand option, once every two hours.  He
> should avoid wetness-humidity and temperature extremes of heat and cold.

R. 23.  Sedentary work is defined as work that "involves lifting no more than 10 pounds at a time

and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R.

§§ 404.1567(a), 416.967(a).  A sedentary job is one that would generally require an employee to

sit about six hours total per eight-hour workday.  See SSR 96-9p, 1996 WL 374185, at *3 (July

2, 1996).

Perozzi raises several objections to the ALJ's findings.  First, he contends that it was

legal error to rely on the opinions of Dr. Hendler because Dr. Hendler was biased against

Perozzi, "completely wrong in his diagnosis," and "the only examiner who found no loss of spinal motion and a negative straight leg raise." Pl. Reply at 5. The bias, it is alleged, arose out of Dr. Hendler's role as examiner in Perozzi's workers' compensation case. Id. The ALJ, however, explicitly accounted for that role in his opinion. R. 25. It is also incorrect to say that Dr. Hendler was the only examiner to find a negative straight leg raise test. Pl. Reply at 5. Both Drs. Bottiglieri and Semble also noted negative straight leg raise tests, R. 236, 264, as the Commissioner notes, Comm'r Reply at 3. Additionally, Dr. Fitzpatrick observed normal muscle strength, stability and range of motion repeatedly, and Perozzi also reported this. R. 346, 350, 358, 390, 402, 406. Accordingly, we find no error in the ALJ's reliance on Dr. Hendler's opinions.

Second, Perozzi contends that it was error not to mention a certain statement of a social security employee who interviewed Perozzi on August 15, 2013 and remarked that Perozzi "was in obvious discomfort while sitting." Pl. Reply at 6 (citing R. 178). But the ALJ is not required to cite all evidence submitted. See Brault, 683 F.3d at 448 ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (internal quotation marks and citation omitted). Given that such evidence does not come from a medical or other treating source, we find no error in the ALJ's failure to cite to it.

Third, Perozzi contends the ALJ's determination that he could sit for the required six hours in an eight-hour workday incorrectly considered Dr. Kaci's opinion. Pl. Mem. at 18. Dr. Kaci, whose opinions the ALJ gave "great weight," R. 26, was the only doctor besides Dr. Gaughan to opine specifically on Perozzi's limitations with regard to sitting, finding that Perozzi had "moderate limitation to . . . sitting," R. 336. Dr. Gaughan, whose opinions the ALJ gave little weight, R. 28, had repeatedly opined that Perozzi could sit for no longer than 30 minutes at

a time or for more than an hour in an eight-hour workday, see R. 500, 504, 515.  However, the

meaning of Dr. Kaci's opinion is unclear.  It is not obvious that a "moderate" limitation on

sitting translates into a set number of hours.  For this reason, the Second Circuit has held that

when compiling an RFC from the record, an ALJ may not rely on opinions that employ the terms

"moderate" and "mild" absent additional information.  Curry v. Apfel, 209 F.3d 117, 123 (2d

Cir. 2000) (such terms are "so vague as to render [them] useless"); accord Selian, 708 F.3d at

421 (concluding that an ALJ, in determining claimant's RFC, could not rely on the "remarkably

vague" opinion of a consulting physician that the claimant "should be able to lift . . . objects of a

mild degree of weight on an intermittent basis") (citing Curry, 209 F.3d at 123-24); Garretto v.

Colvin, 2017 WL 1131906, at *21 (S.D.N.Y. Mar. 27, 2017) ("[The consulting physician's] use

of the word 'moderate' is vague and provides no support for the ALJ's conclusion that plaintiff

engage in these activities for six hours out of an eight hour day."); Young v. Comm'r of Soc.

Sec., 2014 WL 3107960, at *9 (N.D.N.Y. July 8, 2014) (conclusion by single consulting

physician that claimant had undefined "moderate" limitations in sitting not substantial evidence

for finding that claimant could perform sedentary work); Richardson v. Astrue, 2011 WL

2671557, at *12 (S.D.N.Y. July 8, 2011) (consulting doctor's vague conclusion that "[plaintiff's]

ability to sit was 'mildly to moderately' impaired . . . provides no support for ALJ's []

conclusion that [plaintiff] could perform sedentary work"); see also Burgess, 537 F.3d at 128-29

(noting that the opinion of a medical expert is not "sufficiently substantial to undermine the

opinion of the treating physician," when such an opinion vaguely describes an impairment with

words such as "mild" or "moderate") (citing Curry, 209 F.3d at 123).  Therefore, Dr. Kaci's

opinion, on its own, is insufficient support for the ALJ's conclusion that Perozzi may function in

a sedentary job.

The Commissioner cites several cases in support of the ALJ's determination, see Comm'r Mem. at 25, Comm'r Reply at 5, but those cases are inapposite. Two of them, Martin v. Astrue, 337 F. App'x 87, 89-90 (2d Cir. 2009) (summary order), and Burdick v. Astrue, 2013 WL 3713417, at *7 (W.D.N.Y. July 12, 2013), do not address this issue at all. For example, there is no indication that the doctors in Martin ever provided a functional limitations opinion that included the words "mild or moderate," nor did the ALJ use an analogous opinion to determine the claimant's RFC. 337 F. App'x at 89-90. Moreover, Martin was addressing whether a treating physician's opinion merited controlling weight, and concluded narrowly that the physician's opinion was not due controlling weight because three doctors issued opinions substantially inconsistent with it. Id. Burdick, on the other hand, involved much more detailed medical opinions. 2013 WL 3713417, at *7. One doctor whose opinion formed the basis for the RFC opined that the plaintiff in that case could "sit for up to 8 hours in an 8 hour day," while another recommended "no prolonged sitting (no greater than four hours continuous, may sit for a total of 8 hours in an 8 hour shift with breaks) . . . ." 2013 WL 3713417, at *7. Thus, because the medical opinions were sufficiently detailed, the issue presented in this case did not arise.

The other three decisions cited by the Commissioner, Mitchell ex rel. Mitchell v. Comm'r of Soc. Sec., 2015 WL 1505707, at *8-9 (N.D.N.Y. Mar. 31, 2015), Funk v. Astrue, 2012 WL 501017, at *3 (N.D.N.Y. Feb. 15, 2012), and Williams v. Colvin, 2017 WL 3701480, at *7-8 (E.D.N.Y. Aug. 25, 2017), involved vague medical opinions similar to Dr. Kaci's, but these cases too are distinguishable. The record in Mitchell, for instance, contained much stronger corroborating evidence for the RFC determination. 2015 WL 1505707, at *8-9. There, while the ALJ did form an RFC in part from a medical opinion that vaguely "found moderate limitations in standing for long periods," the court noted that five medical opinions, including

from two treating physicians, expressly limited the claimant to light or sedentary work with restrictions.  Id.  The opinions from treating physicians were also reiterated on subsequent follow-ups.  Id.  The court did not note any contrary opinions.  Id.  In a similar vein, the ALJ in Williams explicitly noted that a doctor's vague functional limitations opinion was "of limited utility in determining the claimant's [RFC]."  2017 WL 3701480, at *7 (alterations in original). The ALJ also "did not rely on [the consulting physician's opinion]" as he "only afforded it partial weight."  Id.  Thus, to the extent that the case holds that an ALJ may rely in part on a medical opinion that the ALJ explicitly notes is vague, it plainly differs from the instant case where the ALJ gave Dr. Kaci's opinion "great weight" and did not remark on the opinion's vagueness.  Last, Funk involved an underdeveloped record and the decision remanded the case for further development of the medical record, specifically because the underdeveloped record did not support the RFC.  2012 WL 501017, at *5-6.  The Commissioner appears to cite the case because the decision refused to require the ALJ to recontact a consultative examiner who opined that the "plaintiff had 'moderate limitation in prolonged sitting,'" holding that such an opinion "would not preclude plaintiff from performing sedentary work."  Id. at *3.  But the court in Funk was inquiring only into whether the consultative examiner's opinion was "consistent with [the] assessment [that plaintiff could perform sedentary work]" — not whether the consultative examiner's opinion was too vague to support an RFC determination.   Id.  Thus framed, the holding in Funk has little applicability to the issue in this case.

Because the ALJ should not have concluded that "moderate" limitations on sitting necessarily permit sedentary work, we do not know that he ultimately would have concluded, absent this evidence, that there was substantial evidence to support his determination that Perozzi could sit for 6 hours.  While there is evidence in the record that arguably supports that

conclusion, see R. 228, 234 (Dr. Hendler); R. 243 (Dr. Bottiglieri); R. 322 (Dr. Auerbach); R. 232 (Dr. Sallahian), none of it is definitive and it is more appropriate to allow the ALJ to make the finding with a record not tainted by error.

Finally, we note that while the ALJ stated that the lack of observable muscle wasting or atrophy indicated that Perozzi's pain was not severe or functionally limiting, R. 26, this conclusion is unsupported by citation to any medical source or evidence, and thus constitutes a determination that a lay person such as an ALJ is not equipped to make. See generally Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("In analyzing a treating physician's report, 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.' . . . [Here], as a 'lay person,' the ALJ simply was not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by [the treating physician] in his assessment.") (citations omitted); see also Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (ALJ improperly concluded that an absence of muscle atrophy was inconsistent with a finding of disability). The error also brings into question the ALJ's credibility findings as to Perozzi's limited ability to sit. See Young, 2014 WL 3107960, at *9.

On remand, the ALJ must reconsider the question of whether Perozzi could sit for the required six hours out of an eight-hour workday in accordance with the above. Obviously, the ALJ is free to develop the record further as appropriate.

Because the case is being remanded anyway, we note that Perozzi correctly points out that parts of the ALJ's reasoning suggest that he gave weight to treating source's opinions because they accorded with the ALJ's view of the RFC. Pl. Mem. at 18. Specifically, the ALJ stated that he gave "great weight to Dr. Kaci's opinion as her findings support a residual functional capacity for sedentary work." R. 26. A similar version of this formulation was stated

at other points in the opinion.  See R. 25 ("Although Dr. Hendler's opinion seems to support a light exertional level, it is duly noted that his opinion and examination is not inconsistent with the sedentary exertional level given herein."); R. 26 ("Although a chiropractor is not an acceptable source, some weight was afforded to the opinion of Sallahian which supports the residual functional capacity herein").  These statements imply that particular weight was being given to a treating source's opinion because it was consistent with a finding that Perozzi had an RFC for sedentary work.  This is similar to what occurred in Campbell v. Comm'r of Soc. Sec., 2016 WL 6462144 (S.D.N.Y. Nov. 1, 2016), where the ALJ "first state[d] an RFC determination and then state[d] that [the] medical evidence is consistent with the ALJ's RFC determination." See id. at *13.  Such reasoning is flawed as it "puts the cart before the horse."  Id. at *13 n.15 (noting that courts "previously have criticized ALJ decisions that '[d]etermin[e] the RFC first and then measur[e] the claimant's credibility by that yardstick,' as 'illogical' and 'prejudicial to the claimant.'") (alterations in original) (quoting Cruz v. Colvin, 2013 WL 3333040, at *15-16 (S.D.N.Y. July 2, 2013)) (citing cases); accord Simmons v. Colvin, 2016 WL 1255725, at *15 (E.D.N.Y. Mar. 28, 2016) ("such reasoning is circular and flawed") (internal quotation marks and citations omitted); Snyder v. Colvin, 2014 WL 3107962, at *6 (N.D.N.Y. July 8, 2014). "ALJs are instructed to base their RFC[] determinations on all the evidence before them — including all medical opinions — rather than self-formulate them and then compare them to the various medical opinions in the record."  Mitchell v. Colvin, 2013 WL 5676289, at *7 (E.D.N.Y. Oct. 17, 2013) (emphasis in original) (citing 20 C.F.R. § 404.1545(a)(3)-(4)).  Accordingly, on remand, the ALJ is instructed not to engage in such reasoning.

C.  Application of the Treating Source Rule

We conclude by addressing Perozzi's argument that the ALJ was required to give controlling weight to the opinions of Dr. Gaughan.  Pl. Mem. at 14-18.  He also argues that the ALJ failed to provide adequate reasons for giving "little weight" to Dr. Gaughan's opinions.  Id.

In this case, the ALJ explained that little weight was due Dr. Gaughan's opinions, because Dr. Gaughan's adversarial position in Perozzi's workers' compensation case might have resulted in inflated results.  R. 28.  The ALJ also found that Dr. Gaughan's findings contradicted the overall medical records and Perozzi's reported activities of daily living.  Id.  In that vein, the ALJ noted that he gave greater weight to the opinions of Drs. Kaci, Hendler, Bottiglieri, and Sallahian because, compared with the opinions of Dr. Gaughan, those opinions were "more persuasive and more consistent with the overall medical records and claimant's activities of daily living."  Id.

This explanation meets the standard for giving less than controlling weight to a treating source's opinion.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Halloran, 362 F.3d at 32 ("the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts").  The reasons given also qualify as "good reasons" for the weight ultimately given Dr. Gaughan's opinions.  Greek, 802 F.3d at 375 (citing Burgess, 537 F.3d at 129-30).  An ALJ's opinion need not explicitly mention each reason, as long as the decision substantively applies the regulations.  See Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").  Here, the ALJ explicitly considered "the frequency, length, nature and extent of treatment," of Dr. Gaughan's treating

relationship with Perozzi by noting Dr. Gaughan's role in Perozzi's workers' compensation claim and by summarizing Dr. Gaughan's opinions and recommendations to Perozzi at length in his opinion.  R. 27-28.  The ALJ also explicitly referred to the consistency of Dr. Gaughan's opinion "with the remaining medical evidence" when he noted that the opinions of Drs. Kaci, Hendler, Bottiglieri, and Sallahian were more consistent.  R. 28.  Additionally, the ALJ explicitly recognized "the amount of medical evidence supporting the opinion" by noting the myriad examinations that Dr. Gaughan undertook in treating Perozzi, including MRIs, neurological testing, and EMG testing.  R. 27.  While the ALJ did not expressly mention Dr. Gaughan's specialization, he noted elsewhere the specialization of other treating sources, such as Dr. Innerfield's cardiology specialization, and he outlined all of Dr. Gaughan's efforts to evaluate and treat Perozzi that were consistent with a specialization in physiatry.  R. 29; see, e.g., Crowell v. Comm'r of Soc. Sec., 705 F. App'x 34, 35 (2d Cir. 2017) ("An application of the treating physician rule is sufficient when the ALJ provides 'good reasons' for discounting a treating physician's opinion that reflect in substance the factors as set forth in § 404.1527(d)(2), even though the ALJ declines to examine the factors with explicit reference to the regulation.") (citing Halloran, 362 F.3d at 32-33); Atwater, 512 F. App'x at 70; Ramos v. Comm'r of Soc. Sec., 2015 WL 708546, at *18 (S.D.N.Y. Feb. 4, 2015) (citing Khan v. Astrue, 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013)).

Perozzi contends that the ALJ's determination was flawed because Dr. Gaughan's findings are consistent with those of Drs. Kaci and Sallahian, and consistent with certain findings of Dr. Bottiglieri.  Pl. Mem. at 15.  In fact, there were many points of disagreement.  For instance, Dr. Gaughan was the only doctor to find muscle atrophy in Perozzi's left leg, see R. 504, 515, 619, and consistently find weakness in Perozzi's lower extremities, R. 504, 506-

512, 515, 619; the only doctor to prescribe limitations for the use of Perozzi's hands, R. 501; the only doctor to limit Perozzi to less than an hour of standing over an 8-hour work period, R. 500; and the only doctor to conclude, since the time of the accident through the date of the hearing, that Perozzi was "totally disabled and unable to work in any capacity," R. 492, 495, 504, 513, 516, 620. Dr. Gaughan's findings and opinions thus stand in contrast with the opinions of other treating sources. For instance, Dr. Kaci did not observe muscle atrophy and noted full grip strength bilaterally with intact hand and finger dexterity. R. 335-36. Dr. Kaci also observed limited lumbar flexion at 30 degrees, R. 335, in contrast to Dr. Gaughan's consistent observation that lumbar flexion could not exceed 15 degrees, R. 492, 504, 513, 516. Dr. Kaci observed no sensory deficits, whereas Dr. Gaughan repeatedly identified "decreased sensibility to vibration" in Perozzi's left thigh, R. 492, 495, 513, 516, 619. Finally, Dr. Kaci concluded that Perozzi had "moderate limitation to walking, standing, sitting, pushing, pulling, bending, ability to lift or carry, and stairs or other climbing," R. 336, in contrast to Dr. Gaughan's assertion that Perozzi was "totally disabled," e.g., R. 492.

Dr. Gaughan's findings and opinions were also inconsistent with those of Dr. Sallahian. While Dr. Sallahian did find reduced range of motion and tenderness in Perozzi's lumbar spine, see R. 231, in line with Dr. Gaughan's notes, see R. 504, there were numerous points of disagreement. Dr. Gaughan stated that Perozzi tested positive on the straight leg test on his left leg at 45 degrees, id., in addition to muscle weakness and atrophy in the left leg, id., but Dr. Sallahian found no such results on the left leg, R. 231. Dr. Sallahian also noted that Perozzi exhibited no motor or sensory deficits in the lower extremities and that his spine exhibited no muscle spasm or trigger points upon probing. Id. His ultimate assessment was that Perozzi had a "moderate, partial disability," and accordingly, could perform sedentary work with restrictions

on heavy lifting and repetitive bending.  R. 232.  As with Dr. Kaci's opinion above, this opinion sharply contrasts Dr. Gaughan's consistent finding that Perozzi was totally disabled.  E.g., R. 504.

Dr. Bottiglieri's findings are even more at odds with Dr. Gaughan's.  While both did find paraspinal spasm, see R. 236, 513, and Dr. Bottiglieri observed moderate limitation in Perozzi's flexion range of motion, R. 236, similar to Dr. Gaughan's findings, R. 513, Dr. Bottiglieri observed no neurological deficits in Perozzi's lower extremities and noted that he had intact sensation, full strength, normal flexion of the hip and knees, and negative straight leg raise testing, R. 240.  Soon thereafter, Dr. Bottiglieri referred Perozzi to a neurosurgeon for evaluation, given that "he has not responded at all to conservative managements."  R. 236.  Upon that referral, Perozzi saw Dr. Jack Stern in March 2010 for a surgical evaluation.  R. 224-25.  Dr. Stern recommended against surgery and encouraged further conservative care by Dr. Bottiglieri. R. 224.  At a subsequent examination with Dr. Bottiglieri, he noted that "[r]ange of motion remains minimally restricted in flexion and extension with subjective reproduction of pain."  Id. Subsequently, he certified that Perozzi "is able to return to work as of [June 22, 2010]."  R. 243.

Thus, the ALJ could properly find that Dr. Gaughan's findings were inconsistent with those of Dr. Bottiglieri, as well as Drs. Sallahian and Kaci.  R. 28.  It was within the ALJ's discretion to resolve such conflicts between medical opinions in the manner he did.  See Balsamo, 142 F.3d at 81 (An ALJ may "choose between properly submitted medical opinions."). Under such circumstances, "we defer to the Commissioner's resolution of conflicting evidence." Cage, 692 F.3d at 122.

Perozzi also challenges the ALJ's use of his reported activities of daily living as a basis for awarding less weight to Dr. Gaughan's opinion.  Pl. Reply at 6.  He contends that an ALJ

may not use his activities of daily living as evidence that a medical opinion is inconsistent with the record, unless "[h]is activities rise to a level that would allow for the performance of substantial gainful activity." Id. Perozzi cites no case law for this rule and we find none in support of it. An ALJ has discretion to resolve conflicts in the record, including with reference to a claimant's reported activities of daily living, regardless of the severity of the claimant's limitations in activities of daily living. See, e.g., Domm v. Colvin, 579 F. App'x 27, 28 (2d Cir. 2014) (summary order) ("Here, the ALJ pointed to substantial evidence for giving the narrative statement of [claimant's] treating physician . . . only probative weight, noting that [the physician's] restrictive assessment was inconsistent with . . . [claimant's] testimony regarding her daily functioning."); Roma v. Astrue, 468 F. App'x 16, 19 (2d Cir. 2012) (summary order) (not error for an ALJ to use a claimant's participation in a "broad range of light, non-stressful activities" as evidence contradicting a treating source's opinion).

Last, Perozzi argues that the ALJ improperly discounted Dr. Gaughan's opinion because he rendered it in the context of Perozzi's pursuit of a workers' compensation claim. Pl. Mem. at 16. We agree that an ALJ may not reject a treating source's opinions solely for this reason. See, e.g., Mercado v. Colvin, 2016 WL 3866587, at *15 (S.D.N.Y. July 13, 2016) (ruling that a doctor's role in a claimant's workers' compensation case "is a legally insufficient reason to categorically disregard a treating physician's opinion.") (citing Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) and Colley v. Astrue, 2009 WL 1392535, at *10 (N.D.N.Y. May 12, 2009)). Here, however, the ALJ noted the role of Dr. Gaughan in Perozzi's workers' compensation case as only one factor for giving his opinions little weight. R. 28. In addition to that factor, the ALJ also noted that "the definition of disability in a workers' compensation case is not the same as [under the Act]," the decision is reserved to the Commissioner, and "the opinions of Drs. Kaci,

Hendler, Bottiglieri and Sallahian [are] more persuasive and more consistent . . . ." Id.

Therefore, the ALJ did not err in considering Dr. Gaughan's role in Perozzi's workers'

compensation case.

IV. CONCLUSION

For the foregoing reasons, Perozzi's motion for judgment on the pleadings (Docket # 15)

is granted and the Commissioner's motion for judgment on the pleadings (Docket # 17) is

denied. The case is remanded for further proceedings consistent with this opinion.

SO ORDERED.

Dated: New York, New York
       March 5, 2018

GABRIEL W. GORENSTEIN
United States Magistrate Judge